1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RODERICK MAGGAY,

　　　　　Plaintiff,

　　v.

OFFICER MICKE, et al.,

　　　　　Defendants.

Case No. 21-cv-04994 BLF (PR)

**ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

(Docket No. 45)

　　　Plaintiff, a Federal prisoner who is confined at the Federal Correctional Institution at Herlong, filed the instant *pro se* civil rights complaint under 42 U.S.C. § 1983, against officers at the Santa Rita Jail for unconstitutional acts against him while housed there as a pretrial detainee.  The Court found the amended complaint, Dkt. No. 13, along with a supplemental pleading, Dkt. No. 12, stated cognizable claims and ordered the matter served on Defendants.[1]  Dkt. No. 14.  Defendants D. Micke and E. Perez filed a motion for

---

[1] Plaintiff originally named one of the Defendants as "Officer Perry," but this Defendant has since been correctly identified as Officer Perez who retired from the Alameda County Sheriff's Office in 2020.  Dkt. No. 41.

1   summary judgment on the grounds that no triable issues of fact exist and they are entitled

2   to qualified immunity.[2]  Dkt. No. 45.  Plaintiff did not file an opposition although given an

3   opportunity to do so.  However, the amended complaint is verified and therefore may be

4   treated as an opposing affidavit.[3]  Defendants filed a reply.  Dkt. No. 46.

5          For the reasons discussed below, Defendants' motion for summary judgment is

6   **GRANTED**.

7

8                                        **DISCUSSION**

9   **I.     Statement of Facts**[4]

10         Plaintiff was detained at Santa Rita Jail ("Jail") at the time of the underlying

11  incident.  On November 4, 2018, prior to his arrival at the Jail, Plaintiff suffered a gunshot

12  wound ("GSW") in his left side, middle chest, just below his rib cage.  The bullet fragment

13  did not exit but lodged near his left middle back.  Sazama Decl. ¶ 2, Ex. B[5] (Highland

---

[2] In support of their motion, Defendants submit the declarations of Defendant E. Perez, Dkt. No. 45-10, Defendant D. Micke, Dkt. No. 45-11, Sgt. Ronalda R. Smitherman, Dkt. No. 45-12, Lt. Tyronea Modeste, Dkt. No. 45-13, and Defendants' counsel Jill Sazama of the Alameda County Office of the County Counsel, Dkt. No. 45-14.  With the declarations, Defendants submit exhibits which include videos of the incident, excerpts from Plaintiff's medical records, his booking records, related incident reports, excerpt from a movement log for Plaintiff, and the related jail grievance for this matter.  Dkt. Nos. 45-1 through 45-9.

[3] A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence.  *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge); *see also Keenan v. Hall*, 83 F.3d 1083, 1090 n.1 (9th Cir. 1996), amended, 135 F.3d 1318 (9th Cir. 1998) (treating allegations in prisoner's verified amended complaint as opposing affidavit).

[4] The following facts are taken from Defendants' factual background and are undisputed by Plaintiff who has not filed an opposition.  However, Plaintiff's versions of events from his amended complaint are also included where the accounts differ.

[5] All references to exhibits are to the exhibits accompanying Defendants' summary judgment motion, unless otherwise indicated.  *See infra* fn. 2; Dkt. Nos. 45-1 through 45-9.

2

Hospital medical records excerpt); Dkt. No. 45-3 at 3, 9-13.

Plaintiff was booked into the Jail on November 9, 2018.  Modeste Decl. ¶ 7, Ex. C (booking record excerpts); Dkt. No. 45-4 at 2.  While at the Jail, Plaintiff received wound care for his GSW.  Sazama Decl. ¶ 3, Ex. D (Jail medical records excerpts); Dkt. No. 45-5 at 4, 8, 16-21.  These medical records indicate that Plaintiff's wound was healing prior to the underlying incident of this action.  *Id.* at 16-21.

At approximately 5:45 a.m. on Friday, November 16, 2018, Plaintiff got into a fight with another inmate.  Modeste Decl. ¶ 8, Ex. E (Nov. 16, 2018 incident report), Dkt. No. 45-6 at 2-5; Ex. D, Dkt. No. 45-5 at 28.  Plaintiff was evaluated later that same morning and again in the evening.  *Id.*  During his initial evaluation, Plaintiff's pre-existing gunshot wound was noted as being "clean, dry and intact"; in the evening, "no active bleeding noted… no drainage, no swelling or redness."  *Id.*  At both examinations, the dressing was changed, and Plaintiff was cleared for further incarceration.  *Id.*  Because of the fight, Plaintiff was moved into housing unit ("HU") 22 that same day.  Modeste Decl. ¶ 9, Ex. F; Dkt. No. 45-7 at 2.  Defendant Micke was working in HU 22, and that day was the first time Defendant Micke recalls ever meeting or being aware of Plaintiff.  Micke Decl. ¶ 3.  Defendant Micke observed some of the medical care Plaintiff received after the fight and learned that Plaintiff had suffered a bullet wound prior to his arrival at the Jail, and that a bullet or bullet fragment was lodged in his back.  *Id.* at ¶ 4.  Plaintiff was scheduled to see a doctor for a follow-up visit on Monday, November 19, 2018.  *Id.*; *see also* Ex. D, Dkt. No. 45-5 at 18.

The underlying incident giving rise to this action was a "use of force" incident that took place the following morning, on November 17, 2018.  Shortly before 6:00 a.m., Plaintiff requested further medical attention, complaining that his GSW was actively bleeding.  Dkt. No. 13 at 2-3; Micke Decl. ¶ 5; Perez Decl. ¶ 4; Ex. D, Dkt. No. 45-5 at 8 ("Patient stated that he is concerned that his GSW site is bleeding and is infected after an altercation with another person the day prior." And "Seen for same issue on 11/16/18 by

3

1    PM staff, Drsg [dressing] changed then."). The relevant interactions between Plaintiff and

2    Defendants from that day, as well as with Sgt. Smitherman, were captured on the officers'

3    body-worn cameras ("BWC" [6] [7]).

4        According to Plaintiff's allegations in the amended complaint, Defendant Micke

5    and Perez responded to his request for medical assistance. Dkt. No. 13 at 3. Plaintiff

6    states that Defendant Micke "immediately became hostile and confrontational," repeatedly

7    asking him, "'What's the fucking matter with you.'" *Id.* Plaintiff states that Defendant

8    Micke refused to escort him to medical. *Id.*

9        According to Defendants, in response to Plaintiff's request, Defendant Micke called

10   for a nurse to come to HU 22 and later helped Defendant Perez escort Plaintiff to his exam.

11   Perez Decl. ¶¶ 5, 8; Micke Decl. ¶ 5. That morning was the first time Defendant Perez

12

---

[6] Exhibit A is a flash drive containing videos from the following: (1) "Perez 1" and "Perez 2" from Defendant Perez's BWC, in chronological order; (2) "Micke 1," "Micke 2," and "Micke 3" from Defendant Micke's BWC, in chronological order; and (3) "Smitherman 1" and "Smitherman 2" from Sgt. Smitherman's BWC. Lt. Tyronea Modeste's declaration attests to the authenticity of these videos as true and correct, unaltered and unedited copies of the BWC videos uploaded by the respective officers. Modeste Decl. ¶ 5, Dkt. No. 45-13 at 2.

[7] According to Defendants, all BWC videos submitted in this case have a short silent segment at the beginning, lasting up to 30 seconds. Micke Decl. ¶ 7; Perez Decl. ¶ 6; Smitherman Decl. ¶¶ 5-6; Modeste Decl. ¶ 3. This is due to the fact that when the BWCs are not on, they passively record video, without audio, in 30-second increments, which get overwritten repeatedly over the course of the day. *Id.* If a BWC is turned on, however, any portion of the previously-recorded silent footage that has not yet been overwritten gets added to the beginning of the recording. Micke Decl. ¶ 7; Perez Decl. ¶ 6. Therefore, BWC videos typically have a short segment of silent footage showing what occurred shortly before the BWC was turned on. Micke Decl. ¶ 7; Perez Decl. ¶ 6; Smitherman Decl. ¶¶ 5-6; Modeste Decl. ¶ 3.

Furthermore, the time stamps on all BWC videos taken by Defendant Micke, Defendant Perez, and Sgt. Smitherman, were all set ahead by 10 hours. Micke Decl. ¶ 8; Perez Decl. ¶ 7; Smitherman Decl. ¶ 7; Modeste Decl. ¶ 4. Thus, the first video captured by Defendant Micke, (Micke 1) shows the start time as "13:57:31," when the actual time was 5:57 a.m. Micke Decl. ¶ 8. Likewise, the first video taken by Defendant Perez (Perez 1) shows a start time of "13:57:59," when the actual time was 5:57:59 a.m., and the second video (Perez 2) shows a start time of 15:03:47" when the actual time was 7:03 a.m. Perez Decl. ¶ 7. Lastly, the first video of Sgt. Smitherman (Smitherman 1) shows a start time of "14:25:04" when the actual time was 6:25:04 a.m., and the second video of Sgt. Smitherman (Smitherman 2) shows a start time of "14:39:48" when the actual start time was 6:39:48 a.m. Smitherman Decl. ¶ 7.

recalls ever meeting or being aware of Plaintiff.  Perez Decl. ¶ 3.  At approximately 5:57 a.m., Defendant Perez escorted Plaintiff the entire way to the nurse's station, while Defendant Micke assisted part of the way as he had other duties to attend to during the first part of Plaintiff's examination.  *Id.* ¶ 5; Micke Decl. ¶¶ 6, 10; *see also* Ex. D, Dkt. No. 45-5 at 9.

The video from Defendant Perez's camera recorded the entire visit with the nurse, which lasted approximately 11 minutes.  Ex. A (Perez 1) at 1:53-12:50.  According to Defendant Perez, Plaintiff was argumentative and defensive to the nurse's questions.  Perez Decl. ¶ 10.  Plaintiff insisted on telling the nurse his version of events rather than her referring to the medical records on her computer.  He then advised that his wound had begun bleeding last night, that it had not been bleeding prior to the fight, and he was concerned about internal bleeding.  Plaintiff then lifted his shirt to show her the dressing.  *Id.*  The nurse observed that the dressing was "not saturated or anything" and that it had "dried blood probably from over 8 hours ago."  *Id.*  Plaintiff insisted that his wound had been bleeding since the fight and was a cause for concern, but the nurse disagreed because the wound was not draining.  The nurse also advised that she had been told the wound was actively bleeding, but his dressing did not show such active bleeding.  *Id.*

Plaintiff then asked whether he could be seen by another nurse or doctor, to which the nurse responded that there was no doctor on site, but that he probably had a doctor's visit scheduled.  Perez Decl. ¶ 11.  As the nurse was looking through Plaintiff's medical records on her computer to verify a doctor's appointment, Plaintiff asked for the nurse's name, which she provided, and then he continued arguing with her.  At one point, Plaintiff interrupted himself to ask Defendant Perez if his "PDR" (his BWC) was on, and Defendant said it was.  *Id.*  Plaintiff then continued questioning the nurse and arguing with her about his medical care, occasionally looking towards Defendant Perez's camera.  *Id.*  When the nurse offered to change his dressing again, Plaintiff refused and requested to be seen by a doctor.  *Id.*  Defendant Micke arrived at the nurse's station at about this time, *i.e.*,

United States District Court
Northern District of California

1
2

approximately 6:03 a.m.  Micke Decl. ¶ 11.  Defendant Micke activated his BWC which also recorded the rest of Plaintiff's visit.  Ex. A (Micke 2) at 0:00-7:10.

3
4
5
6
7
8

Plaintiff reiterated his complaints: after the fight his wound had begun bleeding and spotting; he wondered if it might be infected or internally bleeding; and that although he been told he would be seen by a doctor, he had not yet been seen since the day before. Micke Decl. ¶ 12; Perez Decl. ¶ 11.  Plaintiff then turned and asked Defendant Micke to confirm that Plaintiff had been told by a nurse the day before that he would be seen by a doctor.  Micke Decl. ¶ 13; Perez Decl. ¶ 11.

9
10
11
12
13
14
15
16
17

Defendant Micke responded that, after his fight the day before, Plaintiff was checked out by a nurse who said that Plaintiff would be put on a list to be seen by a doctor, but also that the nurse did not specify *when* Plaintiff would be seen by a doctor.  Micke Decl. ¶ 13; Perez Decl. ¶ 12.  Defendant Micke advised that doctors are on-call on the weekends (November 17, 2018 was a Saturday), and only come in for emergencies.  *Id.* Plaintiff then asked, "Wasn't the day before (November 16) a weekday?"  *Id.*  Defendant Micke explained that although November 16, 2018 was a Friday, doctor's appointments do not necessarily get scheduled for the same day they are requested, and likely Plaintiff's appointment was going to be on Monday.  *Id.*

18
19
20
21

Defendant Micke reminded Plaintiff that he had "just came out and told [him] 'can I be seen today,'" and Defendant had immediately responded by taking him to be seen by the nurse.  Micke Decl. ¶ 14; Perez Decl. ¶ 13.  Plaintiff agreed that this was true, and that he "appreciated" Defendant doing this.  *Id.*

22
23
24
25
26
27

Defendant Micke then explained that Plaintiff had been seen by a nurse after the fight the prior day, and that the nurse had treated him, given him medication for the pain, cleared him for further incarceration, and arranged for him to have an appointment with a doctor on Monday.  Micke Decl. ¶ 15; Perez Decl. ¶ 14.  Plaintiff disputed that the nurse had said that the appointment would be on *Monday* and took issue with the delay.  *Id.*  The nurse and both Defendants then re-confirmed that Plaintiff would see a doctor on Monday

28

6

(November 19, 2018), and that there was no doctor on site at present. *Id.*

The nurse then asked Plaintiff if his call for medical attention was because he wanted to have his wound be seen by a doctor, and Plaintiff explained that he was concerned because the fight involved "someone three times [his] size" and that his bullet wound had been "spotting and bleeding since," although it had been healing well prior to the fight. Micke Decl. ¶ 16; Perez Decl. ¶ 15. The nurse then asked Plaintiff, more specifically, what his concern was, and Plaintiff again responded that he was concerned he might be internally bleeding. *Id.* Plaintiff insisted that he needed to have this issue checked, and the nurse explained that she could check his blood pressure but otherwise did not have a way to check for internal bleeding. The blood pressure check did not reveal anything concerning. Meanwhile, Plaintiff continued to complain that he was not receiving adequate medical care although to Defendants, he did not appear to be in any physical or medical distress. *Id.*; Micke Decl. ¶ 17.

Defendant Micke eventually advised Plaintiff that after the nurse checked him out, he would go back to his cell, and that if he had a medical emergency, they would take him to the hospital. Micke Decl. ¶ 18; Perez Decl. ¶ 16. Defendant Micke ordered Plaintiff to get up to go back to his cell. Micke Decl. ¶ 19; Perez Decl. ¶ 17. Defendant Micke repeated his order, and when Plaintiff did not comply immediately, Defendant placed his hands on Plaintiff's shoulders, began lifting him up out of his chair, and started escorting him back to his cell. *Id.* Plaintiff protested this action as he walked out of the nurse's station towards his cell. *Id.* Plaintiff appeared to be upset that he was not receiving the medical attention he preferred. *Id.*

According to Plaintiff Defendant Micke was "irate" and grabbed Plaintiff by the shirt and neck, lifting him off the ground and physically dragging him, choking him by the neck. Dkt. No. 13 at 3.

The use of force which resulted in an incident report took place while Defendants were escorting Plaintiff back to his cell in HU 22 at 6:11 a.m. Micke Decl. ¶ 20; Perez

1    Decl. ¶ 18; Ex. G (Incident Report 18-020147), Dkt. No. 45-8 at 2, 4-5.

2         According to Plaintiff, Defendant Micke slammed him to the floor, face first,

3    grinding his fist into Plaintiff's wound while cuffing him.  Dkt. No. 13 at 3.  Plaintiff

4    claims Defendant Perez assisted Defendant Micke "minimally" by holding Plaintiff while

5    being cuffed.  Dkt. No. 13 at 3.  Plaintiff claims Defendant Perez did nothing to "quell the

6    irate excessive and unnecessary use of force by Officer Micke," despite Plaintiff yelling

7    for help and pleas to stop.  *Id.*

8         According to Defendant Micke, during the escort to Plaintiff's cell, he suddenly felt

9    and observed Plaintiff stop moving forward, tighten up his body and lower his center of

10   gravity, lean slightly back towards him, and plant his feet.  Micke Decl. ¶ 20.  In his

11   training and experience, Defendant Micke believed these actions were pre-assaultive

12   indicators, *i.e.*, they suggested that Plaintiff may be about to turn and attack him. *Id.*

13   Defendant Micke also knew that Plaintiff was still agitated about the medical attention he

14   had received and had just the day before been involved in a fight with another inmate.  *Id.*

15   Per his training, Defendant Micke believed that these factors might prompt Plaintiff to take

16   adverse action against him (as a staff member), as a potential way to earn other inmates'

17   respect.  *Id.*  Therefore, Plaintiff's actions raised security and safety concerns for

18   Defendant Micke.  *Id.*  To overcome Plaintiff's resistance and forestall a potential assault,

19   Defendant Micke redirected Plaintiff's movements by grabbing his shirt and guiding

20   Plaintiff away from himself and slowly down towards the floor, facedown, to be

21   handcuffed.  *Id.* at ¶ 21.  Defendant Micke states that he did not slam Plaintiff onto the

22   floor, nor intend to cause him any harm by taking him to the floor.  *Id.*  Defendant Micke

23   denies using any force to push or shove Plaintiff violently to the floor, but rather asserts

24   that he used no more than that minimal force necessary to get Plaintiff down onto the floor.

25   *Id.*

26        Once Plaintiff was on the floor, Defendant Micke placed one hand on Plaintiff's

27   upper back while guiding his left wrist around behind his lower back to handcuff him.  *Id.*

28                                          8

at ¶ 22.  Defendant Micke states that his hand on Plaintiff's back was not intended to cause Plaintiff pain or discomfort but merely to maintain control over Plaintiff, to assure that he would remain prone, until he was securely handcuffed.  *Id.*  Defendant Micke states that he felt Plaintiff tense his arm as he moved it, which raised concerns that Plaintiff may be resisting the handcuffing.  *Id.*  When Plaintiff began screaming loudly that Defendant was "pushing the bullet," Defendant Micke did his best to avoid doing this while still handcuffing Plaintiff.  *Id.* at ¶ 23.  Defendant Micke knew Plaintiff had a bullet injury in his back but did not know where the bullet was located.  *Id.*  Defendant Micke moved his hands several times to try to avoid pressing on the injury, and then finally placed his left hand on Plaintiff's neck.  *Id.*  These actions lasted less than 15 seconds.  *Id.*  Defendant Micke maneuvered Plaintiff's left wrist around to lie next to his right wrist against his lower back and handcuffed him.  *Id.* at ¶ 24.  Defendant Micke states that he did not use more than the minimal force necessary to accomplish this task.  *Id.*  Once Plaintiff was handcuffed, Defendant Micke stopped using any force.  *Id.* at ¶ 25.  Defendant Micke explained to Plaintiff that he would assist him to a seated position and then to standing position; Defendant then proceeded to do so.  *Id.*  He then escorted Plaintiff to an isolation cell.  *Id.*

According to Defendant Perez, he saw Plaintiff stop walking forward and begin to slump and lean towards his left.  Perez Decl. ¶ 18.  It seemed to Defendant Perez that Plaintiff was moving towards the floor on his own.  *Id.*  Defendant Perez knew Plaintiff was still agitated about his medical care, and it seemed to him that Plaintiff was resisting being returned to his cell and acting in this way to try to get other inmates' attention.  *Id.*  Defendant Perez observed Defendant Micke maintain control over Plaintiff's left arm as Plaintiff slowly descended towards the floor.  *Id.* at ¶ 19.  Defendant Perez did not see Defendant Micke slam or throw Plaintiff violently onto the floor.  *Id.*  Then he observed Defendant Micke secure Plaintiff in handcuffs.  *Id.* at ¶ 20.  Defendant Perez states that he observed Defendant Micke using no more than that minimal force necessary to control

9

United States District Court
Northern District of California

Plaintiff's movements to ensure that Plaintiff remained prone until he was secured in handcuffs. *Id.* Defendant Perez also states that in response to Plaintiff's yelling, he saw Defendant Micke lift his hands and move them to avoid hurting Plaintiff while still handcuffing him. *Id.* Meanwhile, Defendant Perez moved Plaintiff's right wrist around and placed it against Plaintiff's lower back until Defendant Micke brought Plaintiff's left hand around; Defendant Micke handcuffed him. *Id.* Defendant Micke then assisted Plaintiff in standing. *Id.* Defendant Perez escorted Plaintiff with Defendant Micke to an isolation cell. *Id.*

According to Plaintiff, at least three other deputies assisted Defendant Micke in placing Plaintiff in a detention cell. Dkt. No. 13 at 4. Defendants make no mention of other officers in their declarations, and the videos show no other officer's involvement in this incident. Ex. A (Perez 1 and Micke 2).

According to Sgt. Smitherman, taking an inmate to an isolation cell after a use of force incident serves legitimate penological goals. Smitherman Decl. ¶ 9. The goals include, among other things, "giving the inmate an opportunity to clam down, and putting him in close proximity to the nurse's station, so that he could receive medical care, if desired/needed." *Id.* Furthermore the placement allows the inmate to be easily reclassified to another housing unit if necessary. *Id.*

At 6:23 a.m., Defendant Micke activated his BWC and brought two nurses, one of whom saw Plaintiff earlier, to examine him. Micke Decl. ¶ 29; Ex. A (Micke 3). Meanwhile, Sgt. Smitherman responded as the supervising sergeant for HU 22 that morning, to check on the welfare of the inmate and deputies involved in the incident. Smitherman Decl. ¶ 8. She arrived at Plaintiff's isolation cell in time to accompany Defendant Micke in escorting Plaintiff to the nurse's station, which was in the same hallway, where he was once again examined and treated. *Id.* at ¶ 10; Micke Decl. ¶ 29**;** Ex. G, Dkt. No. 45-8 at 5. The video shows that Sgt. Smitherman ordered Plaintiff to be handcuffed and examined at the nurse's station. Ex. A (Micke 3) at 6:24-6:25. Sgt.

Smitherman then activated her BWC at the nurse's station, Ex. A (Smitherman 1) at 0:00-5:35, and observed Plaintiff being treated at the nurse's station alongside Defendant Micke.  Micke Decl. ¶ 29; Smitherman Decl. ¶ 10.  The examination revealed no new injuries, and Plaintiff did not complain of any injuries.  Micke Decl. ¶ 29; Smitherman Decl. ¶ 10; Ex. G, Dkt. No. 45-8 at 5; Ex. D, Dkt. No. 45-5 at 9, 10, 23, 29.  The nurse specifically advised Plaintiff during this exam and after his dressing was removed, that his wound was "clean, dry and intact with no drainage."  *Id*.  Meanwhile, Plaintiff resumed complaining that his prior bullet wound injury may be internally bleeding, to which the nurses again responded that he would be seen by a doctor on Monday.  *Id.*; Ex. D, Dkt. No. 45-5 at 23, 29 (notes of examination after incident).  The medical examination ended at 6:30 a.m., and Plaintiff was escorted back to the isolation cell by Defendant Micke and Sgt. Smitherman.  *Id.*

After Plaintiff was put back in the isolation cell, Sgt. Smitherman asked Plaintiff if he needed anything further from her.  Smitherman Decl. ¶ 11; Ex. A (Smitherman 1) at 6:20-end; Ex. A (Micke 3) at 6:30-end.  Plaintiff responded that he wanted to talk to her and "inform [her] of what's going on."  *Id.*  Sgt. Smitherman promised to return after she had spoken with the officers involved.  *Id.*

At 6:39 a.m., Sgt. Smitherman returned to speak to Plaintiff in the isolation cell and heard his complaints; she activated her BWC to record the exchange.  Smitherman Decl. ¶ 12; Ex. A (Smitherman 2).  Plaintiff spent over eight minutes explaining in detail to Sgt. Smitherman his concerns about his bullet wound and the care he received.  *Id.*  Plaintiff did not complain of any injuries, such as a fractured rib or other serious injury, during the above incident.  *Id.*  Sgt. Smitherman listened to Plaintiff, explaining yet again that he would be seen by a doctor on Monday.  *Id.*  She ultimately suggested that if Plaintiff was still unhappy, he should submit a grievance form which she then provided to him.  *Id.*  This ended the discussion at 6:52 a.m.  *Id.*

At 7:04 a.m., Defendant Perez came to Plaintiff's isolation cell to take pictures of

11

Plaintiff's upper body; he activated his BWC to record their interaction.  Perez Decl. ¶ 24;

Ex. A (Perez 2).  Defendant Perez observed no injuries to Plaintiff while photographing

him, beyond his pre-existing GSW, nor did Plaintiff appear to be in medical distress.  *Id.*

Defendant Perez listened as Plaintiff again complained about his medical concerns and

various matters; Plaintiff did not complain about having suffered a broken rib or any

similar serious injury.  *Id.*

Movement records indicate that on November 17, 2018, Plaintiff was reclassified to

HU 6 from HU 22, at 8:41 a.m.  Modeste Decl. ¶ 9, Ex. F, Dkt. No. 45-7 at 2.

Accordingly, Plaintiff was in the isolation cell for approximately 2 and a half hours.

According to Plaintiff, being placed in an isolation cell effectively "chilled his

ability to exercise his First Amendment right of free speech and such action had no

legitimate correctional goal.  Dkt. No. 12 at 3.  Plaintiff asserts that Defendant Micke's

excessive force constitutes adverse action in retaliation for Plaintiff exercising his First

Amendment right (of free speech) in requesting medical attention under the Fourteenth

Amendment, which are "protected right[s]."  *Id.* at 3.

On November 26, 2018, Plaintiff submitted a grievance about the incident,

complaining of the use of the force.  Ex. H (Grievance 18-2825 and response), Dkt. No.

45-9 at 2-3.  There is no allegation in the grievance that Plaintiff had a broken a rib or

suffered any injuries from this use of force incident.  *Id.* at 2.

On December 18, 2018, which was a month after the use of force incident, Plaintiff

got into another fight with other inmates and suffered a fractured rib.  Ex. D, Dkt. No. 45-5

at 4-7, 5 ("risk of discomfort-pain r/t physical injury from 242"), 6 ("CXR [chest x-rays] 2

views d/t L-sided chest/rib pain – Concerned about Fx [fracture)]"), 7 ("Patient states he

was jumped by 4 other individuals in a HU this morning…."), 10-12, 11 ("Deputy claimed

that 40 minutes ago, inmates had a 242…."), 24 (note dated 12-19-2018, states "X ray by

radiologist on 12/18 showed a non-displaced L 9th rib facture…."), 30 (notes dated 12-18-

2018 discussing condition after fight).

United States District Court
Northern District of California

1   Based on Plaintiff's allegations, the Court liberally construed the amended

2   complaint as stating cognizable claims against Defendant Micke for excessive force and

3   retaliation, and a failure to protect claim against Defendant Perez.  Dkt. No. 14 at 6.

## II.   **<u>Summary Judgment</u>**

5   Summary judgment is proper where the pleadings, discovery and affidavits show

6   that there is "no genuine dispute as to any material fact and the movant is entitled to

7   judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A court will grant summary judgment

8   "against a party who fails to make a showing sufficient to establish the existence of an

9   element essential to that party's case, and on which that party will bear the burden of proof

10  at trial . . . since a complete failure of proof concerning an essential element of the

11  nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v.*

12  *Catrett*, 477 U.S. 317, 322-23 (1986).  A fact is material if it might affect the outcome of

13  the lawsuit under governing law, and a dispute about such a material fact is genuine "if the

14  evidence is such that a reasonable jury could return a verdict for the nonmoving party."

15  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

16  Generally, the moving party bears the initial burden of identifying those portions of

17  the record which demonstrate the absence of a genuine issue of material fact.  *See Celotex*

18  *Corp.*, 477 U.S. at 323.  Where the moving party will have the burden of proof on an issue

19  at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other

20  than for the moving party.  But on an issue for which the opposing party will have the

21  burden of proof at trial, the moving party need only point out "that there is an absence of

22  evidence to support the nonmoving party's case."  *Id*. at 325.  If the evidence in opposition

23  to the motion is merely colorable, or is not significantly probative, summary judgment may

24  be granted.  *See Liberty Lobby*, 477 U.S. at 249-50.

25  The burden then shifts to the nonmoving party to "go beyond the pleadings and by

26  his own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

27  file,' designate specific facts showing that there is a genuine issue for trial.'"  *Celotex*

13

United States District Court
Northern District of California

1    *Corp.*, 477 U.S. at 324 (citations omitted).  If the nonmoving party fails to make this

2    showing, "the moving party is entitled to judgment as a matter of law." *Id*. at 323.

3          The Court's function on a summary judgment motion is not to make credibility

4    determinations or weigh conflicting evidence with respect to a material fact.  *See T.W.*

5    *Elec. Serv., Inc. V. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

6    The evidence presented and the inferences to be drawn from the facts must be viewed in a

7    light most favorable to the nonmoving party.  *See id*. at 631.  The nonmoving party has the

8    burden of identifying with reasonable particularity the evidence that precludes summary

9    judgment.  *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996).  If the nonmoving party

10   fails to do so, the district court may properly grant summary judgment in favor of the

11   moving party.  *See id.*

12          Courts "may not simply accept what may be self-serving account by the police

13   officer," especially in light of contrary evidence.  *Zion v. County of Orange*, 874 F.3d

14   1072, 1076 (9th Cir. 2017) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *see*

15   *id.* (finding summary judgment inappropriate when officer's testimony that a knife-

16   wielding suspect was trying to get up after being shot at 18 times, with 9 of those shots at

17   close range while the suspect was lying on the ground, was contradicted by the video

18   which did not show the suspect trying to get up).  "When opposing parties tell different

19   stories, one of which is blatantly contradicted by the record, so that no reasonable jury

20   could believe it, a court should not adopt that version of the facts for purposes of ruling on

21   a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380-83 (2007) (police

22   officer entitled to summary judgment based on qualified immunity in light of video

23   evidence capturing plaintiff's reckless driving in attempting to evade capture which utterly

24   discredits plaintiff's claim that there was little or no actual threat to innocent bystanders);

25   *see Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 779 (2020) (in ERISA case

26   where the issue was whether plaintiff had actual knowledge of an alleged fiduciary breach,

27   the court indicated that plaintiff's denial of knowledge could be discredited at summary

28

United States District Court
Northern District of California

judgment stage if it was blatantly contradicted by electronic records showing plaintiff viewed a website containing relevant disclosures of investment decisions); *cf. Hughes v. Rodriguez*, 31 F.4th 1211, 1219 (9th Cir. 2022) (district court erred in disregarding all of plaintiff's testimony where bodycam footage of arrest blatantly contradicted some but not all of the testimony; video did not depict whether plaintiff was punched <u>after</u> he was handcuffed, and panel majority found audio of the arrest was also unclear as to the sequence).

### A.   <u>Excessive Force</u>

Plaintiff claims Defendant Micke's actions on November 17, 2018, were "excessive and unnecessary."  Dkt. No. 13 at 3.

The Due Process Clause of the Fourteenth Amendment protects a post-arraignment pretrial detainee from the use of excessive force that amounts to punishment.  *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (citing *Bell v. Wolfish*, 441 U.S. 520, 535-39 (1979)).  To prove an excessive force claim under § 1983, a pretrial detainee must show only that the "force purposely or knowingly used against him was objectively unreasonable."  *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015).  "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."  *Id.* "A court (judge or jury) cannot apply this standard mechanically."  *Id.*   "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'"  *Id.* (quoting *Graham v. Connor*, 490 U.S. at 396).

A non-exhaustive list of considerations that may bear on the reasonableness of the force used include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting."  *Kingsley*, 135 S. Ct. at 2473.

United States District Court
Northern District of California

United States District Court
Northern District of California

Because the *Kingsley* standard applicable to excessive force claims by pretrial detainees is purely objective, it does not matter whether the defendant understood that the force used was excessive or intended it to be excessive. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1069 (9th Cir. 2016) (en banc). A pretrial detainee can prevail by providing "'objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose.'" *Id.* (quoting *Kingsley*, 135 S. Ct. at 2473-74)) (emphasis in original).

The extent of injury suffered by an inmate is one factor that may suggest whether the use of force could possibly have been thought necessary in a particular situation. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). But not every malevolent touch by a prison guard gives rise to a federal cause of action. *Id.* at 9. Although the extent of injury may provide some indication of the amount of force applied, "[a]n inmate who complains of "'a push or shove'" that causes no discernible injury almost certainly fails to state a valid excessive force claim.'" *Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010).

Defendants assert that the evidence and the totality of the circumstances reveal no excessive force by Defendant Micke on November 18, 2018. Dkt. No. 45 at 20. Regarding the first *Kingsley* consideration of "the relationship between the need for the use of force and the amount of force used," Defendants assert that the evidence supports both a need to use force and proportionate response: Plaintiff was arguing with Defendant and then resisted while being returned to his cell which raised a legitimate security concern. *Id.* Defendants assert that Defendant Micke knew Plaintiff was agitated over his medical care, had just been fighting with an inmate the day before, and may have wanted to raise his status in the eyes of other inmates by confronting staff. *Id.* In such circumstances, Defendant Micke acted to overcome Plaintiff's resistance, avoid the confrontation, and redirect his actions. *Id.* Defendants assert that Defendant Micke's actions of guiding Plaintiff to the floor and securing him in handcuffs were a reasonable and proportionate response, weighing against excessive force. *Id.*

16

With regard to the *Kingsley* factor involving "any effort made by the officer to temper or to limit the amount of force," Defendants also assert that the evidence shows Defendant Micke used the minimal force necessary and tempered his response. *Id.* In response to Plaintiff's resistance and the legitimate concern for safety, Defendant Micke redirected Plaintiff's action and guided him to the floor. *Id.* Defendant Micke did not slam Plaintiff to the floor, as Plaintiff claims. *Id.* Nor did Plaintiff complain to anyone, either verbally or in his grievance, that this is what occurred, and there were no signs of any injuries consistent with such a complaint. *Id.* Defendants assert that after Plaintiff was on the floor, Defendants Micke and Perez used minimal force to maneuver Plaintiff's arms behind his back to secure him in handcuffs. *Id.* at 21-22. Once Plaintiff was handcuffed, no further force was used. *Id.* at 22. Defendants assert that this factor also weighs against excessive force. *Id.*

With regard to two more *Kingsley* factors involving "the threat reasonably perceived by the officer" and "whether the plaintiff was actively resisting," Defendants assert that both Defendants Micke and Perez observed Plaintiff suddenly resisting being returned to his cell by ceasing his forward movement and lowering his center of gravity. *Id.* at 22. Defendants assert that Defendant Micke reasonably perceived a threat that Plaintiff might be trying to turn and assault him for the reasons discussed above, and that Plaintiff's resistance to being returned to his cell raised a legitimate security concern. *Id.* Defendants assert that these factors weigh against excessive force. *Id.*

Lastly, Defendants assert that as for the extent of injury to Plaintiff, the evidence shows no injury and certainly not a broken rib. Dkt. No. 45 at 22. The nurses did not detect any new injuries and the medical records do not document any. *Id.* at 23. Plaintiff's grievance of the incident also fails to mention a fractured rib or similar serious injury. *Id.* The medical records also document that Plaintiff's fractured rib did not happen until a month later, after Plaintiff got into another fight with other inmates. *Id.* Defendants conclude that Defendant Micke used a minor amount of force to overcome Plaintiff's

17

resistance and handcuff him and that Plaintiff suffered no injury. *Id.* Defendants assert summary judgment should be granted in favor of Defendant Micke on the claim of excessive force. In reply, Defendants again assert that summary judgment should be entered in their favor. Dkt. No. 46 at 2, citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Plaintiff filed no opposition to dispute the evidence and arguments submitted by Defendants. However, Plaintiff's amended complaint is verified and may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder*, 55 F.3d at 460 & nn.10-11. Plaintiff's allegations in the amended complaint are brief. Dkt. No. 13 at 3. He states that when he requested medical assistance, Defendant Micke refused to escort him to medical. Dkt. No. 13 at 3. Plaintiff states that when he insisted that he needed medical attention, Defendant Micke "became irate, grabbed me by my shirt, then my neck, lifted me off the ground and physically dragged me, choking me by the neck, subsequently slamming me to the floor face first and grinding his fist into the wound while cuffing me." *Id.* From Plaintiff's grievance on the matter, Defendant Micke's action of grabbing him occurred in the nurse's station, at the conclusion of the examination. Dkt. No. 45-9 at 3.

Although the evidence presented and inferences to be drawn from the facts would normally be viewed in a light most favorable to Plaintiff, Defendants have presented video evidence which at times blatantly contradicts Plaintiff's version of events such that no reasonable jury could believe it. This type of evidence is exactly what the Supreme Court addressed in *Scott v. Harris*, 550 U.S. 372. In *Scott*, the plaintiff sued a deputy for excessive force used during a high-speed car chase which resulted in a crash that rendered plaintiff a quadriplegic. 550 U.S. at 375. Because each party's version of events differed substantially, the Court of Appeal adopted plaintiff's version and denied defendant's motion for summary judgment based on qualified immunity. *Id.* at 378. However, there was a videotape that captured the events in question which clearly contradicted plaintiff's

story.  Plaintiff's version gave the impression that, "rather than fleeing from police, [he] was attempting to pass his driving test."  *Id.* at 378-79.  The videotape told "quite a different story": "Far from being the cautious and controlled driver the lower court depicts, what we see on the video more closely resembles a Hollywood-style car chase of the most frightening sort, placing police officers and innocent bystanders alike at great risk of serious injury."  *Id.* at 379-380.  Under such circumstances, the Supreme Court found defendant's use of force, *i.e.*, applying his push bumper to the rear of plaintiff's vehicle in an attempt to terminate the chase by forcing plaintiff off the road, was reasonable in light of the substantial and immediate risk of serious physical injury to others and that no reasonable jury could conclude otherwise.  *Id.* at 386.  In finding defendant was entitled to summary judgment, the Supreme Court held that at the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party "only if there is a 'genuine' dispute as to those facts."  *Id.* at 380.  The Court found that plaintiff's version of events "is so utterly discredited by the record that no reasonable jury could have believed him," such that the Court of Appeals "should not have relied on such visible fiction: it should have viewed the facts in the light depicted by the videotape."  *Id.* at 380-381.

Here, the videos submitted by Defendants blatantly contradicts Plaintiff's claim that Defendant Micke was hostile and confrontational and refused to escort him to medical when he first requested it and that Defendant Micke then irately grabbed him by the neck, choked, and dragged him.  *See infra* at 19-20.  Rather, the videos show that Defendant Micke remained composed throughout his interaction with Plaintiff and did not act in the manner described by Plaintiff.  Based on the record, no reasonable jury could credit Plaintiff's version of events with respect to what occurred prior to what took place in the common area.  Accordingly, under *Scott*, 550 U.S. at 380-83, the Court should not simply adopt all of Plaintiff's version of the facts for purposes of ruling on Defendants' summary judgment motion but rather view the facts in light of the video evidence.

Having carefully reviewed the evidence and construing the evidence in the light

most favorable to Plaintiff when appropriate, the Court finds that there is no genuine dispute as to any material fact relating to Plaintiff's claim of excessive force against Defendant Micke based on his use of force on November 17, 2018, and that the forced used was not objectively unreasonable after considering the *Kingsley* factors. 135 S. Ct. at 2473. The Court has viewed the video evidence submitted by Defendants in support of their summary judgment motion. There is no dispute regarding the authenticity of these videos, as Plaintiff has filed no opposition to refute them or object to their admission. Accordingly, there is no dispute that the videos are true recordings of the "use of force" incident at issue in this action. *Id.* These videos along with Defendants' declarations and other exhibits are sufficient evidence that affirmatively demonstrate that no reasonable trier of fact could find other than for Defendants.

Firstly, Plaintiff alleged that when he first requested medical for his bleeding GSW, Defendant Micke refused to take him, was "hostile and confrontational," and repeatedly asked him, "What's the fucking matter with you." Dkt. No. 13 at 3. However, the videos show otherwise. While Defendant Micke was certainly impatient, his attitude was neither hostile nor confrontational. Ex. A (Micke 1) and (Micke 2). Furthermore, although Defendant Micke uttered several profanities, at no time in these videos did he ask Plaintiff, "What's the fucking matter with you." *Id*. Moreover, Plaintiff claims Defendant Micke refused to take him to medical as requested, but the evidence clearly shows that Plaintiff was taken to the nurse's station within minutes of making his request. *See supra* at 3-4.

Next at the nurse's station, Plaintiff engaged in a lengthy exchange with the nurse, explaining his concerns and repeatedly asking to see a doctor although he was advised that none was available until Monday and that he already had an appointment. *See supra* at 5-7. When it was clear that nothing further could be done, Defendant Micke told Plaintiff that after his blood pressure was taken, he would be returning to his cell. Ex. A (Micke 2) at 6:20-6:35. After the nurse indicated that his blood pressure was normal, Defendant Micke advised Plaintiff that there would be no more arguing. *Id.* at 6:35-6:45. Once the

20

nurse completed her examination, Defendant Micke said to Plaintiff, "Let's go, let's go, up." Ex. A (Micke 2) at 7:00-7:12; (Perez 1) at 12:43-12:55. When Plaintiff ignored the order and continued speaking to the nurse, Defendant Micke loudly repeated his command, "Let's go," as he moved behind Plaintiff's chair. *Id.* When Plaintiff again failed to respond, Defendant placed his left hand on Plaintiff's left shoulder and his right hand under Plaintiff's right armpit and lifted him up out of his chair while turning his body towards the door. *Id.* Defendant Micke did not grab Plaintiff by his neck or choke him. *Id.* Defendant Micke maintained a firm hold of Plaintiff's shirt, just underneath his right armpit, while guiding him away from the nurse's station; there was no dragging as Defendant Micke walked slightly behind and to the left of Plaintiff with his right hand gripping Plaintiff's shirt just under his right armpit. *Id.* As he walked away from the nurse's station, Plaintiff protested being forced to return to his cell and complained that Defendant was "putting his hands" on him. Ex. A (Micke 2) at 7:01-7:25; Ex. A (Perez 1) at 12:44-13:07. These videos clearly contradict Plaintiff's allegations that Defendant Micke grabbed him by the shirt *and* neck, lifted him off the ground, and physically dragged and choked him by the neck. Dkt. No. 13 at 3. Nor was there any discernible injury from this contact to suggest that the force was excessive. *See Wilkins*, 559 U.S. at 37-38. Accordingly, no reasonable jury could conclude that Defendant Micke's use of force at this time was excessive.

What exactly happened in the next following minutes is less clear. Shortly after entering the common area, Plaintiff moved slightly ahead of Defendant Micke who maintained his righthand grip on Plaintiff. Ex. A (Micke 2) at 7:23-7:30; Ex. A (Perez 1) at 13:03-13:20. Within the next few seconds, the video shows Plaintiff bending forward and somehow ending up lying facedown on the floor. As he was descending to the floor, Plaintiff began crying out loudly as if in distress. *Id.* According to Defendants, Defendant Micke felt Plaintiff stop moving forward, tighten his body, and then lower his center of gravity, while leaning slightly back towards Defendant Micke and planting his feet. Micke

Decl. ¶ 20.  Defendant Perez states that he saw Plaintiff stop walking forward and begin to slump and lean towards his left; it appeared to Defendant that Plaintiff was moving towards the floor on his own.  Perez Decl. ¶ 18.  However, it is unclear from the video footages, which provide a limited point of view, exactly how Plaintiff ended up on the floor.

Once Plaintiff was on the floor, Defendant Micke placed one hand on Plaintiff's upper back while he guided Plaintiff's left wrist around behind Plaintiff's lower back to handcuff him.  Ex. A (Micke 2) at 7:28-7:39; Ex. A (Perez 1) at 13:05-13:22.  When Plaintiff began screaming loudly that Defendant Micke was "pushing the bullet," Defendant Micke removed his hand from Plaintiff's upper back, then placed his left hand for a moment on Plaintiff's back before removing it again to hold the back of Plaintiff's neck.  *Id.*  Meanwhile, Defendant Perez was on the right side of Defendant Micke, from where he moved Plaintiff's right wrist around to Plaintiff's lower back as Defendant Micke brought Plaintiff's left hand around.  Ex. A (Perez 1) at 13:20-13:34.  Then Defendant Micke handcuffed Plaintiff.  *Id.*; Ex. A (Micke 2) at 7:40-7:58.  The foregoing actions – Plaintiff getting on the ground to being handcuffed – lasted about 14 seconds.  *Id.*

After Plaintiff was handcuffed, the use of force ceased.  Ex. A (Micke 2) at 7:56-8:19; Ex. A (Perez 1) at 13:36-14:00.  Defendant Micke explained to Plaintiff that Defendant would assist him to a seated position, and then to a standing position, both of which occurred.  *Id.*  Plaintiff resumed complaining about Defendant Micke's actions.  *Id.*  After Plaintiff was handcuffed and standing, Defendants escorted him to an isolation cell.  Ex. A (Micke 2) at 8:19-8:56; Ex. A (Perez 1) at 14:00-14:37.

Viewing the evidence in the light most favorable to Plaintiff and assuming that Defendant Micke used force to take him to the ground as he claims, Defendants have put forth evidence which demonstrates the absence of a genuine issue of material fact with regard to the reasonableness of Defendant Micke's actions.  Analyzing the *Kingsley* factors shows that Defendant Micke acted with objectively reasonable force rather than excessive.

22

First of all, the force used by Defendant Micke as shown by the videos was far from the violent actions alleged by Plaintiff.  Although it is unclear from the videos exactly how Plaintiff ended up on the floor, the videos still clearly show that Defendant Micke did not, as Plaintiff claims, "slam" him to the floor.  Even if Defendant Micke did apply hard force in taking Plaintiff to the ground, which was out of view of the camera, and pressed on his back, Defendant Micke states that he acted because he perceived Plaintiff resisting.  He and Defendant Perez state that Plaintiff was the one who suddenly stopped moving forward and slumped, which caused Defendant Micke to react in accordance with his training, by redirecting Plaintiff's movements down towards the floor.  Plaintiff offers no evidence in opposition that he did not make the assertive gestures described by Defendants which prompted their use of force.  Accordingly, the Court agrees with Defendants that the relationship between the need for the use of force due to Plaintiff's resistance and the amount of force used indicates that the force was not excessive.  *Kingsley*, 135 S. Ct. at 2473.

The videos also show that Defendant Micke made efforts to temper and limit the amount of force he used.  When Plaintiff started to cry out in distress about pressure to the bullet in his back, Defendant Micke promptly removed his hand and thereafter avoided putting any further pressure to Plaintiff's back; nothing in the videos shows Defendant grinding his fist into Plaintiff's GSW, as Plaintiff claims, and no reasonable jury could conclude otherwise.  Once Plaintiff was handcuffed, no further force was applied; again, no reasonable jury could conclude otherwise.  Accordingly, the evidence shows that the use of force was necessary, and that Defendant Micke made efforts to temper and limit the amount of force he applied, which is another *Kingsley* factor that supports the reasonableness of his actions.  *Id.*

Other *Kingsley* factors also weigh against excessive force.  With respect to a perceived threat, Defendant Micke explains in his declaration the threat he perceived due to Plaintiff's actions in light of the circumstances leading up to the incident, i.e., Plaintiff's

23

dissatisfaction with the medical care, his fight from the day before, and the desire to gain respect from other inmates.  Defendant Perez also attests to Plaintiff's agitated state and the possible motivation to get other inmate's attention.  Accordingly, it cannot be said that Defendant Micke's belief that Plaintiff posed a threat was unreasonable.  Lastly, there is simply no evidence that Plaintiff suffered any injuries from this incident.  Defendants submit evidence showing that Plaintiff's broken rib was a result of an altercation with an inmate a month later.  *See supra* at 12.  The lack of any discernible injury here suggests that the force was not excessive.  *See Hudson*, 503 U.S. at 7; *Wilkins*, 559 U.S. at 38.

Based on the above considerations under *Kingsley*, Defendants have shown that there is no genuine issue of material fact as to whether Defendant Micke applied force on Plaintiff in an objectively unreasonable manner.  *See Celotex Corp*., 477 U.S. at 323.  The burden then shifts to Plaintiff to designate specific facts showing that there is a genuine issue for trial.  Plaintiff has failed to meet this burden, having filed no opposition with any objective evidence showing that Defendant Micke's actions were not rationally related to a legitimate governmental objective of overcoming Plaintiff's resistance or that it was excessive in relation to that purpose.  *See Castro*, 833 F.3d at 1069.  In other words, Plaintiff has failed to point to specific facts showing that there is a genuine issue for trial, *Celotex Corp*., 477 U.S. at 324, or identify with reasonable particularity the evidence that precludes summary judgment, *Keenan*, 91 F.3d at 1279.  Accordingly, Defendant Micke is entitled to judgment as a matter of law on the excessive force claim against him.  *Id*.; *Celotex Corp*., 477 U.S. at 323.

## B.    <u>Retaliation</u>

Plaintiff claims that Defendant Micke used excessive force against him in response to Plaintiff's request for medical attention and that Defendant's action of placing him in an isolation cell chilled the exercise of his First Amendment right to free speech.  Defendants assert that the evidence does not support any retaliation claim against Defendant Micke.  Dkt. No. 45 at 23.

24

Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted).

Defendants assert that the evidence shows that when Plaintiff requested to see a nurse the morning of November 17, 2018, Defendant Micke promptly granted the request. Dkt. No. 45 at 24. Once he was with the nurse, Plaintiff received ample opportunity to voice his concerns and express his complaints about his medical care. *Id.* He also received responses to his complaints. *Id.* Defendants assert that Defendant Micke waited patiently for Plaintiff to receive care and also confirmed Plaintiff's description of events from the prior day when asked. *Id.* Defendants assert that Defendant Micke ordered Plaintiff to return to his cell only after it became clear that there was nothing further the nurse could do for Plaintiff at that time. *Id.* Defendants also contend that the use of force occurred not in response to Plaintiff's request to receive medical care but *after* Plaintiff resisted being returned to his cell and *after* he already received that care. *Id.* (original emphasis). Furthermore, Defendants assert that after the alleged use of force, Defendant Micke obtained medical care for Plaintiff a second time. *Id.* Defendants assert that these actions are inconsistent with the notion that Defendant Micke used force to retaliate against Plaintiff for requesting care in the first place. *Id.*

Defendants also contend that Plaintiff's allegation that Defendant Micke's actions chilled the exercise of his First Amendment right to free speech is not supported by the evidence. Dkt. No. 45 at 24. Defendants point out that the videos show Plaintiff exercising his First Amendment free speech rights repeatedly, even after the use of force and his placement in the isolation cell. *Id.* Plaintiff continued to complain to the nurses during his second visit to the nurse's station and in his conversation with Sgt. Smitherman.

25

1
2
3
4
5

*Id.*  Plaintiff was then provided with a grievance form which he subsequently completed and submitted.  *Id.*, citing Ex. H.  Lastly, Plaintiff again expressed his complaints to Defendant Perez when he came to take photographs of Plaintiff's condition.  *Id.* at 25. Plaintiff has filed no opposition to dispute Defendants' argument or their evidence with respect to this claim.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

After a careful review of the evidence, the Court finds there exists no genuine dispute as to any material fact relating to Plaintiff's retaliation claim against Defendant Micke.  Plaintiff asserts that the adverse action, i.e., excessive force, was taken against him because he requested medical care.  However, the Court has determined above that the undisputed evidence demonstrates that Defendant Micke applied reasonable and proportional force in response to a reasonably perceived threat, i.e., Plaintiff's resistance to returning to his cell.  *See supra* at 21.  Accordingly, it cannot be said that the evidence establishes causation or that Defendant Micke's actions did not reasonably advance a legitimate correctional goal, the second and fifth *Rhodes* elements.  Furthermore, the evidence also shows that Defendant Micke's actions did not chill Plaintiff's exercise of his First Amendment right to free speech.  The videos show that Plaintiff was given ample opportunity and time to voice his numerous complaints to various people, including while he was in the isolation cell.  Defendants also submit evidence showing that placing Plaintiff in an isolation cell served legitimate penological goals, such as time to cool down, proximity to the nurse's station, and ease of reclassifying to another housing unit.  *See supra* at 10.  Moreover, Plaintiff was provided with a grievance form which he went ahead and filed based on the incident.  Accordingly, this evidence does not show that Defendant Micke retaliated against Plaintiff because of his protected conduct.  In response, Plaintiff has filed no opposition to dispute Defendants' evidence.

25
26
27

Based on the undisputed facts, Defendants have shown there is an absence of a genuine dispute of material fact with respect to the retaliation claim against Defendant Micke.  *See Celotex Corp.*, 477 U.S. at 323.  Having filed no opposition, Plaintiff has

28

United States District Court
Northern District of California

failed to meet his burden of identifying with reasonable particularity the evidence that precludes summary judgment, *see Keenan*, 91 F.3d at 1279.  Accordingly, Defendant Micke is entitled to summary judgment on this retaliation claim.  *See Celotex Corp.*, 477 U.S. at 323.

### C.   Failure to Protect

Plaintiff claims that Defendant Perez did nothing to "quell the irate excessive and unnecessary use of force by Officer Micke," despite Plaintiff yelling for help and pleas to stop.  Dkt. No. 13 at 3.  Defendants assert that the evidence does not support a failure to protect claim against Deputy Perez.  Dkt. No. 45 at 25.

A prison official may be liable for failure to intervene if he or she is present when another official uses excessive force against a prisoner.  *Robins v. Meecham*, 60 F.3d 1436, 1442 (9th Cir. 1995).  The Court has determined above that there was no excessive force used by Defendant Micke against Plaintiff because the use of force was not objectively unreasonable.  *See supra* at 22-23.  Put another way, where there has been no underlying risk, i.e., excessive force, it cannot be said that Defendant Perez was unreasonable for failing to protect against it.  Accordingly, Defendant Perez is entitled to summary judgment on the failure to protect claim against him.  *Celotex Corp.*, 477 U.S. at 323.

### D.   Conclusion

Based on the foregoing, Defendants have established the absence of a genuine issue of material fact with respect to the claims against them.  *See Celotex Corp.*, 477 U.S. at 323.  Having filed no opposition, Plaintiff has failed to identify with reasonable particularity any evidence that precludes summary judgment.  *See Keenan*, 91 F.3d at 1279.  Accordingly, Defendants are entitled to summary judgment.  *Id.*; *see Celotex Corp.*, 477 U.S. at 323.

### CONCLUSION

For the reasons stated above, Defendants D. Micke and E. Perez's motion for

27

summary judgment is **GRANTED**.[8]  Dkt. No. 45.  The excessive force, retaliation, and failure to protect claims against them are **DISMISSED** with prejudice.

This order terminates Docket No. 45.

**IT IS SO ORDERED.**

Dated:  __November 2, 2023____

_____
BETH LABSON FREEMAN
United States District Judge

United States District Court
Northern District of California

---

[8] Because the Court finds no constitutional violation occurred, it is not necessary to reach Defendants' qualified immunity argument.

28

Order Granting MSJ
PRO-SE\BLF\CR.21\04994Maggay_grant-msj